```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION


Daniel Mollohan, on behalf
of Christopher D. Mollohan,    :

         Plaintiff,            :

     v.                        :       Case No. 2:10-cv-914

                               :       JUDGE GREGORY L. FROST
Commissioner of Social                 Magistrate Judge Kemp
     Security,                 :

         Defendant.            :
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Daniel Mollohan, filed this action on behalf of his son, Christopher D. Mollohan, seeking review of a decision of the Commissioner of Social Security denying Christopher's application for supplemental security income. That application was protectively filed on October 22, 2008, and alleged that Christopher became disabled on October 1, 2005.

After initial administrative denials of his claim, plaintiff was given a video hearing before an Administrative Law Judge on November 12, 2009. In a decision dated November 20, 2009, the ALJ denied benefits. That became the Commissioner's final decision on August 13, 2010, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on December 14, 2010. Plaintiff filed his statement of specific errors on January 18, 2011. The Commissioner filed a response on February 11, 2011. Plaintiff filed a reply brief on March 2, 2011, and the case is now ready to decide.

II. The Testimony at the Administrative Hearing

A transcript of the administrative hearing is found at pages 30 through 53 of the administrative record. The following is a summary of the testimony given at the hearing.

Christopher was the first witness called. He said he was a freshman in high school and got average grades (mostly As and Bs). He had a few friends at school and played baseball. He got along well with his teachers, but not so well with some of his classmates.

Christopher lived with his parents and a younger sister. He helped care for the household pets (two cats and a dog). He also played video games and visited with friends in his spare time. He was taking a medication called Strattera for ADHD, and it helped him to concentrate at school. Typically, he could understand instructions from his teachers; if not, he would ask a friend to help him understand. He had gotten in trouble in school for behavioral issues, but not recently.

Christopher's father, Daniel Mollohan, also testified. He stated that his son's grades were somewhat lower than Christopher described and that he was currently failing one of his classes. He agreed that Christopher had neighborhood friends, but said that Christopher had trouble following directions and that he was not comfortable leaving him home alone or allowing him to go out by himself. He confirmed that there were occasional problems with classmates. He also testified that Christopher received special help from his teachers, especially in the area of reading, and that he would have his tests read to him. He could also be interruptive at times.

The last witness to testify was Dr. Mary Buban, a medical advisor. She had reviewed Christopher's school records and concluded that from a cognitive viewpoint, he had marked difficulty because he was at only 58 percent of age level. He had some problems attending and completing tasks but the

impairment in that area was less than marked. She noted that although he did get special help in school he was in regular classes. He had a less than marked impairment in his ability to interact with and relate to others, and no problems moving or manipulating objects. His language skills were problematic, but his health and well-being were not limited. She thought he suffered from borderline intellectual functioning, but, although the school records mentioned an oppositional defiance disorder, that was not severe. She specifically disagreed with assessments that he had a serious problem with attending and completing tasks, noting that her review of the entire record led her to the conclusion that the level of impairment in that area was not as significant as indicated on the assessment forms.

III. The Medical and Educational Records

The medical and educational records begin at page 122 of the administrative record. They contain the following information pertinent to this case.

A teacher questionnaire prepared by a consulting teacher, Melanie Ohler, on August 26, 2009, showed Christopher's reading, math and written language skills to be at the third grade level (he was in ninth grade at the time). He had serious or very serious problems with comprehension, understanding, written expression, recall, and applying problem-solving skills. The same was true with respect to his ability to pay attention, focus, refocus, carry out multi-step instructions, wait to take turns, organize materials, complete homework assignments, work accurately, and work at a reasonable pace. He had no serious issues relating to others and no problem with physical activities. He did, however, have a serious problem handling frustration. (Tr. 122-29).

An educational performance report was prepared by Ms. Ohler when Christopher was in seventh grade. That report showed that

he would sometimes forget to take his homework home but that he did complete assignments in class and also participated appropriately. He was weak in the areas of focusing and following multi-step instructions. He had good social interactions, however. (Tr. 150-51). Several years before, IQ tests demonstrated a delay in cognitive ability, and his adaptive behavior was in the moderate low range, with weaknesses in communication and daily living skills. He began to receive special education services at that time. (Tr. 154).

Ms. Ohler also completed a teacher questionnaire on a form provided by the Social Security administration. On that form, she again indicated a number of serious problems in acquiring and using information and in attending and completing tasks. In the latter area, she identified seven areas (out of a total of thirteen) where Christopher had serious problems, and an eighth area (organizing own things or school materials) where he had a very serious problem. As support for these ratings, she noted that Christopher rushed through school work to get finished, his work was messy and illegible, and the answers were usually not correct. He also had difficulty following directions. (Tr. 318-22).

Christopher was evaluated by Dr. Sarver, a psychologist, on December 18, 2008. He was in the eighth grade at that time. His mother described his most significant problem as "he gets frustrated easy." His grades and behavior appeared to be within normal limits within the special education placement. He got along well with friends and teachers, but had some problems relating to his parents. At the evaluation, he did not demonstrate behaviors consistent with ADHD. Dr. Sarver thought he would have difficulty organizing, structuring and working toward goals, containing his anger, managing his frustration, and controlling his impulses. His level of intellectual functioning

was within the mentally retarded range, but his working memory and processing speed were within the low average range.  Dr. Sarver diagnosed an oppositional-defiant disorder and mild mental retardation and rated his GAF at 55, which shows moderate impairment.  His cognition was at 50% of age appropriate level, while other abilities were at either 75% or 100% of age appropriate level. (Tr. 356-62).

Dr. Voyten reviewed the records and, on December 31, 2008, completed a form indicating that Christopher had one marked impairment, in the area of acquiring and using information.  She believed his impairment in the area of attending and completing tasks was less than marked, relying on Dr. Sarver's diagnosis of oppositional-defiant disorder and his belief that Christopher's skills in various areas were 75% of age appropriate level.  That finding was approved by another reviewing psychologist, Dr. Terry.  (Tr. 364-75).

Finally, there are a number of notes from Christopher's treating pediatrician, Dr. Clark.  On a form completed on multiple occasions, Dr. Clark indicated that Christopher's symptoms included hyperactivity, inattentiveness, impulsivity, task completion, distraction, frustration, peer relations, ODD, OCD, and anxiety.  He diagnosed and treated Christopher for ADHD.

### IV. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 12 through 24 of the administrative record.  The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Christopher was a school-aged child on the date the application was filed and was an adolescent as of the date of the hearing.  The ALJ next found that he had not engaged in substantial gainful activity from his application date forward.

Concerning impairments, the ALJ found that Christopher had

-5-

severe impairments including ADHD and borderline intellectual functioning/mild mental retardation.  He also found that these impairments, taken singly or in combination, did not meet or equal any impairment listed in the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).  Additionally, he found that the impairments were not the functional equivalent of any impairment described in the Listing of Impairments.  This finding was based upon an analysis of six different domains of functioning, as required by the regulations relating to a child's disability claim.  The ALJ found a marked impairment in only one area of functioning, that of acquiring and using information; as to the other five areas, the ALJ found either that Christopher's impairment was "less than marked" or that he had no impairment at all.  Because a claim of disability filed on behalf of a child can be granted only if he or she has a marked impairment in two of these areas or an extreme impairment in one, the ALJ denied the claim.

## VI.  Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff raises two issues concerning the correctness of the administrative decision. As plaintiff's memorandum sets out these issues, they are (1) whether the ALJ should have found that Christopher had marked limitations in more than one area of functioning, and (2) whether the ALJ erred in rating the severity of Christopher's impairment. The Court reviews the administrative decision under this legal standard:

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402

U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole.  Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

The regulations concerning a child's application for disability benefits set out a somewhat different framework than the one which governs applications by adults.  As the Court of Appeals has summarized that procedure,

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? *** An impairment can equal the listings medically or functionally ***. The criteria for functional equivalence to a listing are set out in §416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
>
> (2) Attending and completing tasks;

 (3) Interacting and relating with others;

 (4) Moving about and manipulating objects;

 (5) Caring for yourself; and

 (6) Health and physical well-being.

§ 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:

"Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

§ 416.926a(e)(2)(i).

"Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

§ 416.926a(e)(3)(i).

Kelly v. Commissioner of Social Sec., 314 Fed. Appx. 827, 832 (6th Cir. February 2, 2009). Plaintiff argues that Christopher satisfied these requirements in two different ways: first, because the evidence compels the conclusion that he has a marked impairment in two of these six areas, specifically in the area of attending and completing tasks; and, second, because he suffers from mental retardation and at least one other severe impairment, and that combination meets Section 112.05 (D) of the Listing of Impairments found at 20 C.F.R. Pt. 404, Subpart P, Appendix 1,

Part B. Alternatively, he argues that this latter issue was not properly dealt with by the ALJ.

The first argument revolves around the ALJ's discussion of whether Christopher has a marked impairment in the area of attending and completing tasks. That was an issue addressed in the two evaluations done by Ms. Ohler, the teacher who had been his special education consultant, and both times, she noted that he had a fair number of either serious or very serious limitations in this domain. The medical expert, Dr. Buban, appeared to testify that if she used this form alone to evaluate the degree of Christopher's impairment in this area, it would be a marked impairment:

> Q. I'll, I'll ask a question. Looking at this form, attending and completing tasks, is, is this form consistent with a finding of a problem, but not a marked problem?
>
> A. If I just use this form, it would be a serious problem.

(Tr. 51). She also testified, however, that based on the IEP's, statements from other teachers, and the consultative examination done by Dr. Sarver, she considered the impairment to be less than marked. Id.

The ALJ resolved this issue by noting, first, that this area of functioning involves the child's ability to focus and maintain attention, to begin, carry through, and complete activities, to avoid impulsive thinking, to prioritize completing tasks, and to manage time. See Tr. 19-20, citing 20 C.F.R. §416.926(h) and Social Security Ruling 09-4p. The ALJ acknowledged that the record contains evidence of Christopher's being "off task" on assignments and that his father had said he needed to have instructions repeated. Exhibit 6E, which includes Ms. Ohler's completion of the Social Security form addressing this particular issue - and which, according to Dr. Buban, showed a marked

-9-

impairment in attending and completing tasks - was cited for the proposition that Christopher's reading skills were a relevant strength and that he learned well with visual directions and through hands-on experience.  That comment was not made on the form itself.  In fact, on the form, Ms. Ohler stated that "Chris rushes through his school work to get finished quickly.  It is often messy and most often incorrect answers.  Chris has a hard time following directions."  (Tr. 320).  The comments cited by the ALJ come from the IEP for the 2008-2009 school year, which is also part of Exhibit 6E.  Finally, the ALJ cited to Dr. Buban's testimony that Christopher "could learn a trade" and his own testimony that he could play action video games for up to two hours, played baseball, and followed baseball on television, "all activities requiring attention and concentration."  (Tr. 20).  Based on these factors, the ALJ found that Christopher's impairment in this area was "less than marked."  Id.

In defending the ALJ's decision, the Commissioner points to other questionnaires completed by Ms. Ohler indicating that it was only sometimes true that Christopher failed to finish things he started or that he was inattentive or easily distracted.  On these same forms, however, Ms. Ohler also stated that it was often true that he could not concentrate or pay attention for long and that he had difficulty following instructions.  (Tr. 383-91).  These forms were completed at about the same time as the Social Security form, and to the extent that there is some conflict in the record, the ALJ made no attempt to resolve it (and, in fact, the administrative decision does not mention these latter forms at all).  The Commissioner's memorandum filed in this Court also refers to support for the ALJ's decision in the opinions of the state agency reviewers and Dr. Sarver, but these are also not mentioned in the rationale given.

On this issue, it is impossible to avoid the conclusion that

the ALJ simply considered part of the record, primarily the most favorable part, and disregarded the rest, without providing a sufficient explanation for doing so. The isolated comments found in the IEP which is a part of Exhibit 6E do not necessarily relate at all to the issue of attending and concentrating, and they were cited to the exclusion of other portions of the same exhibit showing a marked problem in this area. Conflicts in the evidence, such as the ones noted above, either in the statements made by Ms. Ohler or between her statements and the opinions of others, are neither identified nor explored in the administrative decision. Additionally, as pointed out in the reply memorandum, the ALJ did not discuss at all, in this section of the decision, Ms. Ohler's 2009 evaluation on which she again indicated either serious or very serious problems in the area of attending and concentrating, including issues with paying attention when spoken to directly, focusing long enough to finish tasks, refocusing, organizing, completing assignments, and completing work accurately without careless mistakes. By failing to discuss or explain away these various pieces of evidence, the administrative decision in this case runs afoul of the precepts that "[s]ubstantiality of the evidence must be based upon the record taken as a whole" and that "[a] substantiality of evidence evaluation does not permit a selective reading of the record." See Trudell ex rel. Bushong v. Apfel, 130 F.Supp. 2d 891, 895 (E.D. Mich. 2001), citing, inter alia, Garner v. Heckler, 745 f.2d 383. 388 (6th Cir. 1984). Because that is what appears to have occurred here, a remand for a more complete review and discussion of all of the relevant evidence on this point is required.

    The second issue in the case deals with the way in which the ALJ treated evidence that Christopher's condition may have met or equaled Section 112.05(D) of the Listing of Impairments. That

section presumes disability when a claimant suffers from mental retardation and at least one other significant physical or psychological impairment. Here, the ALJ found another such impairment, so the question is whether substantial evidence supported the conclusion that Christopher did not suffer from mental retardation.

In discussing one aspect of this issue, which is Christopher's IQ test scores, the ALJ noted that there were two tests administered - one in 2001, which was indicative of borderline intellectual functioning and which did not satisfy the prerequisites of this Listing (an IQ score of 70 or below), and one administered more recently, which did produce a qualifying score. Plaintiff's memorandum points out that the former test is, under Section 112.00(D)(10) of the Listing, not considered sufficiently current to be valid, so that the only applicable score is the one obtained by Dr. Sarver. The ALJ's decision does not discuss this factor. It also is unclear as to whether Christopher was found to suffer from mild mental retardation or borderline intellectual functioning. The ALJ found that one of his two severe impairments was "borderline intellectual functioning (BIF)/mild mental retardation." These are not the same impairment, particularly for purposes of determining if Section 112.05(D) comes into play. As the Court of Appeals has stated, "[t]he Secretary, in promulgating Listing 12.05 C [which is the adult equivalent of Listing 112.05(D)], expressly singled out individuals with Mild Mental Retardation for special treatment in determining entitlements to disability benefits." <u>Brown v. Secretary of Health and Human Services</u>, 948 F.2d 268, 270 (6th Cir. 1991). Thus, determining if a claimant suffers from mild mental retardation, as opposed to some other mental impairment, is crucial to the decision-making process.

In discussing whether Christopher's condition met or equaled

a listed impairment, the ALJ did not specifically mention Listing 112.05(D).  Perhaps this is because he did not make the required distinction between borderline intellectual functioning and mild mental retardation, and therefore did not analyze the issue as one arising under that Listing.  Again, although the Commissioner's memorandum filed in this Court mentions various items of evidence from which it might have been determined that Christopher does not suffer from mild mental retardation, that evidence is not cited for that proposition in the administrative decision.  Because the case will be remanded for further analysis of the first issue, on remand, the ALJ should also make a clear determination of whether Christopher's impairment meets the criteria set forth in Listing 112.05(D) and, if not, why not.

### VII.  Recommended Decision

Based on the above discussion, it is recommended that the plaintiff's statement of errors (#10) be sustained to the extent that this case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

### VIII.  Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge
